Mr. Mooseley, good morning. Welcome to the court. Please proceed. Good morning. May it please the court. The judgment in this case has to be reversed because there is simply no evidence to support the jury's verdict, especially on the issues of infringement, lost profit damages, and willfulness. Let's take infringement first to try to have some clarity and order here. That's great. The first asserted claim I'll turn to is Claim 7 of the 813 patent, which recites an electronic circuit as one of its elements coupled to the thermopile, which eventually provides an indication of an internal temperature within the biological tissue, and that term internal temperature was construed by the district court to mean the temperature of the region existing beneath the surface of the biological tissue target for measurement. There's absolutely no dispute on this record that the accused thermometers do not provide an indication of that temperature. Instead, they provide an indication of a patient's oral temperature, which corresponds to a voltage reading based on radiation sensed at the surface in the temple area. Was the construction that the district court adapted put forth by Exergen? I'm not sure, Your Honor, but there's no dispute on it now. We're not challenging that construction. Exergen is not challenging that construction on appeal, so we're all satisfied with that. It's simply a matter of there being no evidence in the record to support the finding of the jury, the apparent finding of the jury, that the thermometers in this case provided an indication of that temperature. That temperature is simply never measured, never computed, never calculated, never known. You have to succeed on all these assertive claims to show no infringement supportive evidence. That's correct. So maybe we should go on to the next claim. Agreed. Before we go to the next, just quickly on 813, isn't it true that both the patented device and the accused structure measure simply the surface radiation of the skin? The actual physical radiation is radiation emanating from the skin surface, correct? In the case of the patented device, Your Honor, the patent clearly draws a distinction. It's true that the physical embodiment, the preferred embodiment disclosed, is an ear thermometer, which is placed into the ear canal and senses radiation emitted from the tympanic membrane, but it makes crystal clear that that was well known in the prior arc up to that point. It was emitted in the background of the 813 patent. The advancement here, the claimed improvement, is a further adjustment of whatever radiation is being sensed at the surface of the tympanic membrane to go internal to the tissue below the tympanic membrane. No, but you're not saying that there's any measurement internally, actual measurement internally. There's a calculation. That's correct. A calculation is drawn from the radiation that comes from the surface. Yes, that's correct. Nothing that pierces the skin anywhere. Yeah, yeah, that's correct, Your Honor. So what's the distinction then? The distinction from the 813 patent is that in 813, the calculation that is made to derive a reading is a calculation that derives a reading correlated to the oral temperature as opposed to the accused. I got it backwards. The patent correlates to an internal tissue temperature, whereas the accused correlates to an oral temperature, but that's just the difference in the correlation. Well, the correlation is critical here, Your Honor. We're talking about, remember, the district court's construction required a calculation of the temperature below the surface of the temple. In this particular instance, we're talking about an embodiment that senses radiation emitted in the forehead region. So it's not enough just to say, well, we're calculating some internal temperature somewhere in the body. We're providing a correlation that looks up some other temperature like oral. That's not anywhere near sufficient. What we have to show is to prove infringement of this claim, what needs to be there is some indication that there's a computation, a calculation, a lookup, something of the temperature existing in that region below the forehead. But that's simply not here. Thank you. Turning to 205, Claim 1, it's a pretty straightforward issue. The claim requires a peak radiation measurement to obtain a peak temperature signal. The accused advises, again, it's undisputed, specifically reject and do not rely upon any kind of peak radiation measurement. Don't record it or don't rely on it? Don't rely on it in any way. It's specifically rejected and not used as part of the calculation for the temperature signal that's displayed. But it still selects it, correct? It measures it. It senses it. There's going to be a sensing window. And, of course, any of these sensing devices is necessarily going to, whatever the maximum reading is, is the peak. And I can't think of a better way to avoid infringement of this claim than to say whatever the maximum reading we got, we're throwing it out. But the underlying, the patented issue, wasn't it that it just had to detect the patented radiation? And isn't that what you do here? You detect the peak amount, you just don't use it? I'll direct you to the claim, Your Honor. It says specifically, electronically detecting the peak radiation from the multiple areas to obtain a peak temperature signal. That's the part that's missing here. We never obtain a peak temperature signal. Turning to the 685 patent, Claim 1. And, unfortunately, upon rereading the briefs in preparation for this morning's argument, I fear that we've perhaps been distracted by an issue about how much lateral component there is versus vertical and so forth. There's a fundamental issue here that we need to address first, which is there's no evidence of a single act of direct infringement by any customer anywhere. So before we can have a claim of inducement on the part of defendants in this case, we have to have some evidence of some customer buying this device and using it in an infringing manner, and there simply is no evidence to that effect on this record. There's also an issue with respect to the peak temperature again, is there not? That's correct. So the same issue with respect to the 205 also applies to Claim 1, 685. The last, the fourth independent claim that's been asserted is Claim 27 of the 685, which again goes back to, it's very similar to Claim 1, or Claim 7, rather, of the 813 patent, the first one we discussed. This claim requires measuring the temperature of the temporal artery through skin. Again, there's no dispute that the accused devices simply do not measure, compute, calculate in any way that temperature. At a bare minimum, Your Honors, this case has to be remanded for a new trial. There's absolutely no dispute on that point. Even Exegent agrees that the willfulness finding of this jury cannot withstand scrutiny. I'd like to quote from the district court when we move for a mistrial based on the improper testimony that came in over the course of several days in violation of Rule 411. Improper testimony, are you referring to the insurance and indemnity testimony that came in? I'm sorry, yes, that's correct, Your Honor. It was a clear violation of Rule 411. The district court recognized that it was an error eventually, and at JA 7003, he had this to say. Because this case has to be tried over, I'll tell you quite frankly, the result of a mistrial is the result of being an error in the first place. The case has to be tried over again. And so my view is we might as well try it because you, meaning the defendants here, might win. And nobody will ever know I made a horrendous mistake. It's a pretty candid admission on the part of the district court that there was an error here that undoubtedly prejudiced the jury's findings. Why wasn't the district court's curative instruction found at 282 sufficient to cure any error that was committed? This is a very strong curative instruction that the court gave to the jury regarding the evidence that came in on indemnity and damages. And as you know, the case law is clear that courts presume that juries follow judges' instructions. A couple of points on the curative instruction. First of all, the district court itself acknowledged that curative instructions would have, in this instance, would have a limited value based on the extent, the pervasive nature of the testimony that was given here. This was not one or two isolated instances of an improper question, and it's all outlined in our briefs. I'm not sure the court went that far. But looking at the strong instruction, ladies and gentlemen, I admitted that testimony in error. All of it now has been stricken from the record, and I instruct you to disregard it. It is not relevant to any contention. And he went on and on and on. This is a very strong curative instruction. Well, with respect, Your Honor, that instruction wasn't given until the end of the case, long after the testimony had been given and had its prejudicial effect on the jury. It was buried among all the other courts' numerous instructions on all aspects of patent law. It's a very lengthy charge to the jury, and that was one of the instructions. You're right that it's buried in a long, long list of instructions. Well, you can argue almost everything in the jury instruction is buried. That's just the nature of a jury instruction. But legally, all of those instructions are deemed to be presented to and understood by the jury and understood at the time just before they retire to deliberate. I understand the point, Your Honor. All I can point to is that it's a matter of degree. There are certainly instances where courts have held that curative instructions were insufficient to undo the damage that was done at trial. This is one of those instances. If you look at the cases, what you'll typically find are where there's an isolated misstatement, an isolated improper question, a curative instruction could be sufficient. On this record, this curative instruction was not sufficient. Before your time expires, what do you have to say about the validity of the 205 patent? Thank you. The validity of the 205 patent is pretty straightforward. The O'Hara reference discloses each and every limitation of the claims. The only one that's in dispute is whether or not we're dealing with peak radiation from multiple areas, and the disclosure of O'Hara could not be more clear that it displays the peak radiation from the moment it's picked up from its base unit as it moves past the face and goes into the ear canal. It's sensing radiation the whole time, and it displays at the end of that process the peak. And it's measuring all throughout that period of time, not simply from the moment the button is pushed to do a calculation. That's correct. It's making measurements, and again, the disclosure is absolutely plain that it displays the peak since the time of removal. I'd like to turn briefly to the subject of damages. This is an instance where, again, there's simply no evidence that Exergen could have made the sales that the defendants made in early 2001, particularly before they obtained FDA approval to sell the device on July 12, 2001. Again, Exergen was required to prove that but for defendants' infringement, they would have made every single one of those sales. It would have been legally impossible for them to make the sales before they received FDA approval, and as a factual matter, they were in no position to make the sales. They didn't even begin calling on customers until late 2001, after most of the sales in question had already occurred. You're also challenging the denial of your motion to allege inequitable conduct. That's correct. And we review that on an abusive discretion standard. Where in your amended complaint are the particularities required to plead inequitable conduct? I see that my time is up. I'll respond to the question. The proposed amendment to the complaint set forth in great detail exactly which references we were talking about, which statements were made to the Patent Office that we felt were in error. It doesn't talk about who committed this alleged inequitable conduct. I'll be happy to review in detail the pleading and respond in my rebuttal time to that. I would just say this, that Exergen doesn't appear to be arguing before this Court that the pleading was not specific enough. Instead, its appeal is based on a futility argument. So even Exergen isn't attempting to defend the Court's decision on the rationale that it gave. All right. We'll restore your rebuttal time since we asked a lot of questions. Ms. Harvey. Good morning, Your Honors. Good morning. Welcome. Thank you. I think to address the infringement questions, I can clarify each of those three patent claims by pointing out a particular claim language that didn't get mentioned. With respect to the Claim 7 of the 813 patent, and this also goes to the issue of my allegedly improper argument in closing that they were hiding out the claim language, I pointed out to the jury, look carefully at Claim 7 because it doesn't require that you detect and display the internal temperature that you've detected. It says you have to provide an indication of it. It's the last clause of Claim 7 of the 813 patent. And so at that point in the closing, I was pointing out that where they choose to display an oral equivalent, which they themselves characterize as oral equivalent temperature, that correlates, as you mentioned, to the detected temporal artery temperature. They are providing an indication of internal temperature. Their premise of infringement, of non-infringement for Claim 7, would require to read that clause providing an indication out of the claim by saying simply that you detect it and then you report the internal temperature that you have detected. But that's not what they're appealing in terms of your statements during closing arguments. During closing, you told the jury on multiple times that you wanted to address the issue of internal temperature and oral temperature and suggested to them multiple times that they were the same, which is completely contradictory to the judge's construction of the claim. There are two issues of the meaning of internal temperature going on, and Judge Lindsay corrected me and instructed the jury that his meaning for internal temperature was what governed their deliberations of infringement of that claim. However, an internal temperature, the other issue is whether or not an oral temperature is a surface temperature. Let me use the word surface or external temperature, as opposed to an internal temperature in the sense of a medically relevant temperature. And so the oral equivalent is a recognized medically relevant temperature. Let's forget the word internal temperature. Judge Lindsay corrected the jury to the extent that I was saying oral is the internal temperature that's being displayed. But because oral temperature is recognized as a medically relevant temperature, and as the reference we pointed out, the Hootis reference showed back at the time of the 813 patent, doctors can in their heads translate from a pulmonary artery temperature if they have that, a tympanic temperature, a rectal or an oral temperature. Those are all medically relevant temperatures. They provide an indication of one another. Does medically relevant appear in the claim? Medically relevant does not appear in the claim. But the whole purpose in the 813 patent obviously is to obtain a meaningful human temperature, a temperature that can be used for diagnosis and treatment. And so any temperature recognized by a doctor that can be used for diagnosis and treatment serves the purpose of the invention. Well, that may be true, but that's not consistent with the claim construction, is it? Well, the claim only requires that you display, a display provides an indication of the internal temperature. So if a doctor... Well, I'm talking about the claim construction that the district judge made, which is the claim construction that the jury was to apply, the temperature of the region existing beneath the surface of the biological tissue targeted for measurement. Exactly, and there is no dispute, there really cannot be any dispute. I mean, I don't understand why there should be any discussion and certainly any argument to a jury about some other temperature, unless you're arguing claim construction, but that's an issue you should have discussed with the judge, not with the jury. No, what I'm arguing is that a plain meaning in light of the Hootis article, and in light of what a person of ordinary skill in the art, who may be a medical doctor would understand about temperature, is that one temperature in the body provides an indication of another temperature. But that's not what you told the jury, you said to them at one point, I'll point out some other places where we see the evidence where everybody else thinks an oral temperature is an internal temperature. That goes completely contrary to the court's construction of the claim in 813. I acknowledge that, and I see, it is a semantic problem which Judge Lindsay corrected in his instruction to the jury. Was his correction sufficient though? Unlike the curative instruction on the indemnity issue, his curative instruction at page 238 just told the jury it is different, and you will see my definition, he's talking about internal temperature, it is different from the one that Ms. Harvey referred to, and you already used my definition. Was that sufficient? I believe it was, because I think he gave that instruction very close to their deliberations, and I think that it was very clear that the jury paid close attention. If you look at the verdict form, for instance, they found non-infringement of one of the claims of 205, showing that they understood this precise point. That claim that they found not infringed required the device to actually display the temperature detected. In other words, claim 2 of the 205 patent said you detect it, and then you display what you've actually detected here at the temporal artery, and they found that not infringed because, of course, the other device displays the oral equivalent temperature. But they did find the 813 infringed. They did find it infringed, but what I'm pointing out is they recognized the difference between choosing what to display for purposes of the user's convenience. You may be more familiar with an oral temperature, and therefore you may choose to display that. I acknowledge the semantic problem of the word internal. What I'm saying is that the plain meaning of providing an indication would allow you to choose to display an oral equivalent temperature. You would still have met the limitation of 813 because you have detected the temperature of the temporal artery, and the oral equivalent temperature does provide an indication of that. Why are the claims of the 205 patent not inherently anticipated by O'Hara? The principal reason is the lack of all of the elements of 205 in the O'Hara patent. Which element is missing? The element that's missing is that it is detecting the radiation from multiple surfaces of the biological tissue. The claim says, let me get 205 in front of me right here. Here we go. Detecting temperature of biological tissue, sensing infrared radiation from a target, sensing, this is the third clause of 205, sensing radiation from multiple areas of the biological tissue, then electronically detecting the peak radiation from the multiple areas to obtain a peak temperature signal. The multiple areas have to be of the biological tissue that you're interested in. It's multiple areas of biological tissue. There's no that you're interested in. Of biological tissue. When that device moves, O'Hara teaches, it tried to deal with ambient temperature, and what do we do about the fact that it's cool in here and that changes what you sense. He tried to deal with it by heating the device up in a housing to 98 degrees, close to the temperature of what you were going to be detecting to reduce the errors that it introduced. As you pull that out of its heated housing and you move it, yes, the detector is on and it's seeing all the radiation, but this isn't biological tissue. No, but it's seeing the radiation from the cheek, from the outer ear, from the inner ear, and ultimately from the tympanic membrane. Right, and you're not trying to detect the temperature of your chin. Maybe not, but it's detecting it. It is. Isn't that a problem? It is, but it is also detecting, so we understand that point. It's detecting everything along the way, and it has to be multiple areas of the biological tissue. I don't mean to interrupt, but that's all the claim calls for. Yes, but because it's been heated up, all that time that it's going from here to here, it is also detecting its own temperature. So what? The claim doesn't say you only detect the biological tissue. It doesn't say you only detect the biological tissue. Well, it does say it. It says you're detecting the multiple areas of radiation from the biological tissue. It's doing that, and it's detecting another temperature. Because that is the temperature you're interested in. You're interested in the human temperature, not the temperature of the table in the room. And when it is going from here to your ear, it is detecting its own temperature because it's been heated up. But it's also detecting the radiation coming from the surface area of the side of the face, the outer ear, the inner ear. That's what your own expert, Dr. Pompei, said. The thermopile is seeing all that radiation, yes. It's reacting to all the... But isn't that a problem, then, in terms of anticipation? Because the claim is not a consisting-of claim. It's a comprising claim, so it doesn't foreclose the possibility that maybe it senses more than one thing. Well, the last clause says electronically detecting the peak radiation from the multiple areas. That's of the biological tissue. And OHARA does that. To obtain a peak temperature signal. But any of these things that it has detected either in the environment or on the outside of the face is not the peak radiation from the biological tissue. It is the peak radiation from the biological tissue and the device itself. And you cannot obtain a temperature of the biological tissue when it is using the radiation it has detected from itself to calculate the temperature. It is only when it is in the ear canal, so that it is close to 98.6 degrees, that it is finally seeing human body temperature and not detecting its own temperature. It has to be in an environment that's hotter than it is before it is actually detecting. It might be easier for me to agree with you if claim one of the 205 patents talked about a method of detecting the temperature of the tympanic membrane. That would certainly limit the focus of the claim. But the claim is much broader than that. And I think that opens the door for OHARA to play a more significant role here. Well, and you also see that in OHARA was cited, it has been cited repeatedly against this whole family of patents for years and years. And Dr. Pompei distinguished it expressly in the text of the 205 patent. And in his later patent, OHARA said, by the way, that device that I have has a very wide field of view. So, in fact, it's really only seeing one spot at any time. It is not distinguishing multiple areas of tissue. It's seeing and averaging the radiation over the entire spot. And Dr. Pompei also testified that his device has a much narrower field of view so that it actually does see multiple areas. So the 877 patent of OHARA that's cited also teaches that OHARA is not really seeing multiple areas at all. It only sees a single spot at a time. I see I'm about to get into my rebuttal time. Before you sit down, on the 685 patent, what evidence was there that any customer engaged in direct infringement? Let's just concede for purposes of this that there is none. I don't think any is required under ACCO brands if the instructions necessarily will result in the customer infringing the patent. That's the theory that we rely upon here. We did not take survey evidence of customers or doctor's offices. So you concede there really wasn't any. For purpose, there may be some. I'm not sure what purpose it would be for, but you concede that there wasn't any. But I don't believe it's necessary under ACCO brands. If I may make one point on ACCO brands, of course in that case there were two different sets of instructions. You could use it way A and then way B, and that was why ACCO said it doesn't necessarily infringe. Here the instructions say, and at page 7360 of the record, Mr. Gerlitz made it very clear. He said you use the device by going from the left side of the eyeball to the right side of the eyeball, and you scan all around that area. His early instructions for the ThermoTech device said scan around the area. That has a lateral component. It is absolutely clear that he's instructing them to scan within the meaning of that claim, and only when he learned of the 685 patent issuing with the word laterally in it did he remove that language, showing consciousness, I'll point out, of the 685 patent. But that may go to the intent issue, but not the correct infringement. It's an interesting question. Because inducement requires intent, we have, in the absence of removing that language from the last set of instructions, I think we have clear intent that that diagram with the circle is intended for them to scan around, and that's how he demonstrated it to the jury. He did this, left side of eyeball to right side. So does the introduction of one further set of instructions where he said, oh, wait, no, do it vertical, then the consumer should ignore the dotted area. I think that's an interesting question. My time's up. All right. We'll restore the two minutes since we had so many questions. Mr. Midgley, you have three. Thank you. I want to just quickly touch on the provided indication argument which came up. I think this reference to the Hootis chart proves too much. If displaying some temperature somewhere in the body is providing an indication of the temperature of the tissue below the surface of the forehead, then the patent is trivially invalidated. It was well known in the prior art that there were temperature sensors out there that showed the surface temperature at the tympanic membrane, and under this new theory of infringement, those would necessarily provide an indication of the claimed internal temperature, so it proves too much. Secondly, with respect to the argument on O'Hara, Ms. Harvey made reference to the fact that the 205 patent discloses a very narrow field of view. Of course, none of that language is in the claims, and if it were in the claims, these accused devices wouldn't infringe. They have a very broad field of view. They're intended to go on the forehead, so I'm not sure how that advances anything. I wanted to also respond to the question about our inequitable conduct pleading. Rule 9B states that we are—or there's the McGinty case, we've cited it, that says Rule 9B is intended to give adequate notice of a party's fraud claim. I think the pleading clearly sets that forth upon rereading it here this morning. I can see that we didn't specifically identify by name the individual who supposedly committed the fraud. That may have been an oversight on our part, but I think it's clear that we gave adequate notice of what the intent was, and these representations, it's a matter of public record that they were made by exergence patent attorney. Lastly, I wanted to just quickly touch on the subject of willfulness. Again, this case was tried before Seagate. Under the new Seagate standard, there simply can be no evidence that the defendant's conduct in this case was objectively reckless. So the case, at a bare minimum, has to be remanded, but it can be decided as a matter of law that there was no evidence sufficient to sustain the jury's verdict of willfulness. Unless there are any other questions? Thank you. Thank you. Ms. Harvey, two minutes on the cross-examination. Thank you, Your Honor. I just wanted to address briefly the issue of the evidence in support of willfulness under the Seagate standard, which says it has to rise to a level of objective recklessness. So, of course, the entire case was tried at a time when the opinion of counsel was paramount, and there was an enormous discussion about all of those issues in the case, which will come out in the wash on a remand. I know the opinions are still relevant, but Voda v. Curtis says let the district court judge sort out these issues. I do think, though, that this record shows there is a benchmark for objectivity beyond the opinions of counsel, and that's the evidence of the Safety First device, which was the first device that SOT built and which Safety First was offering for sale in the United States and ceased selling. Here is a retailer of longstanding, a commercial entity who is aware of the device, is aware of exergence patents, requests a license, is refused a license, requests assurance from the seller that this will not cause a problem for them, and then in the context of all of that information decides I'm not going to sell. So we have the evidence. But there wasn't any evidence that the appellant here was involved in the preparation or review of those materials you're relying on in Safety First, was there? Well, I'm not sure how a retailer would know how to describe how the device works. Certainly the FDA approval of the device was sought. So are you just arguing based on inferences that they had to know, was there any evidence before the trial court that the appellant was involved with the Safety First marketing package? There is no evidence that they directly created that packaging. However, they obtained the FDA approval. The device could only be sold in accordance with it, and therefore they must have necessarily provided input to that packaging. Did you have anything that was submitted to the FDA in terms of how things were described? I don't remember seeing anything. Trial Exhibit 61 is SOTS FDA approval file in which they got FDA approval. Does it refer to the Safety First product specifically? No, Your Honor. But we have a retailer, an objective retailer. May I continue, Your Honor? You can answer the question. Yes. There is nothing directly about Safety First in that FDA file, but it is Trial Exhibit 61. All right. Thank you both. The appeal is taken under submission.